**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| ERIC LOVE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **Case No.:** _____ |
| | ) | |
| NATHAN DEAL, in his official | ) | |
| capacity as Governor for the State | ) | **VERIFIED COMPLAINT** |
| of Georgia, FRANK POE, in his official | ) | |
| capacity as Executive Director for | ) | |
| Georgia World Congress Center | ) | |
| Authority, PAUL GUERRICCI, in his | ) | |
| official capacity as Director of the | ) | |
| Department of Public Safety for | ) | |
| Georgia World Congress Center | ) | |
| Authority, and ANTONIO JACKSON, | ) | |
| individually and in his official capacity | ) | |
| as Police Lieutenant for the | ) | |
| Department of Public Safety for | ) | |
| Georgia World Congress Center | ) | |
| Authority, | ) | |
| | ) | |
| Defendants. | ) | |

COMES NOW the Plaintiff, Eric Love, and avers the following:

## INTRODUCTION

1.     This is a civil rights action brought under 42 U.S.C. §§ 1983 and

1988, challenging Ga. Code Ann. § 10-9-14(d) and Geo. L. Smith II Georgia

World Congress Center Authority ("Authority") Regulations and Ordinances, 4.23

*et seq*., on their face and as applied to individual, religious expression taking place on public sidewalks and ways adjacent to facilities under the control and management of the Authority, including Centennial Olympic Park.

2.     Plaintiff Eric Love seeks with this action injunctive relief, declaratory relief, and nominal damages against Defendants Nathan Deal, in his official capacity as Governor for the State of Georgia, Frank Poe, in his official capacity as Executive Director for the Authority, Paul Guerricci, in his official capacity as Director of the Department of Public Safety for the Authority, and Antonio Jackson, individually and in his official capacity as Lieutenant for the Department of Public Safety for the Authority.

3.     This action is based on Plaintiff's right to free speech and due process as guaranteed in the First and Fourteenth Amendments to the United States Constitution.

4.     Defendants' actions have deprived and will continue to deprive Plaintiff of his fundamental rights as guaranteed in the First and Fourteenth Amendments to the United States Constitution.

5.     Each and every act of Defendants, as alleged herein, was committed under the color of state law and authority.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over the claims for constitutional and civil rights violations under 28 U.S.C. §§ 1331 and 1343, the request for declaratory relief under 28 U.S.C. §§ 2201 and 2202, and the request for attorney fees under 42 U.S.C. § 1988.

7.     Venue is proper in the Northern District of Georgia under 28 U.S.C. § 1391(b), as all of the claims arise in this district and all Defendants reside in this district.

## PLAINTIFF

8.     Plaintiff Eric Love ("Love") is a resident of Douglasville, Georgia.

## DEFENDANTS

9.     Defendant Nathan Deal is the Governor for the State of Georgia.  In his official capacity, among other duties, he oversees the enactment, promulgation and enforcement, of all state laws, including those set out in Chapter 10 of Ga. Code Ann., the Geo. L Smith II Georgia World Congress Center Act.

10.     Frank Poe is Executive Director of the Authority.  In his official capacity, among other duties, he oversees all aspects of the Authority, including oversight of policies that regulate expression and other activities taking place on property under the control and management of the Authority.

11.    Defendant Paul Guerricci is the Director of Public Safety for the Authority.  In his official capacity, he is charged with overseeing the enforcement of Georgia state laws and Ordinances and the Authority's Regulations and Ordinances.

12.    Defendant Antonio Jackson ("Lt. Jackson") is a police lieutenant with the Department of Public Safety for the Authority.  Lt. Jackson, like other police officers in his department, has arrest powers under state law.  In his official capacity, Lt. Jackson is charged with enforcing state law and the Authority Regulations and Ordinances.

## STATEMENT OF FACTS

### Love's Desire to Speak on Public Sidewalks Close to Popular Events

13.    Love is a Christian who is inspired and motivated to share his Christian faith with others in public places.

14.    Love cares deeply about people, and wants to help them find fulfillment through God.  He is therefore compelled to tell people about Jesus Christ and His offer of salvation.

15.    To communicate this message, Love typically preaches, that is, he orally proclaims his religious beliefs to individuals in close proximity to him.  He also displays signs and hands out literature about his beliefs.  When given the

opportunity, Love also engages willing individuals in cordial conversations about his faith.

16.   Love does not yell when he preaches; he only speaks loud enough to be heard by those near him, like someone delivering a speech in public.  His preaching is effective because he can reach several people at the same time.  This method also leads to follow-up conversations.

17.   Love also values conversations.  They give him the chance to address particular concerns or questions individuals might have about his beliefs.

18.   Love occasionally uses signs because they present a condensed message to many people at once, prompting them to consider the message and engage Love in a discussion about it.

19.   He distributes literature so he can impart information about his faith with people who are on the move and have no time to discuss it.  They can take literature with them and read at their own leisure.

20.   Regardless of means that he employs, Love always expresses his views in a peaceful and respectful manner.  He realizes that others might disagree with his viewpoints, but he does not try to offend or insult anyone with his speech; he wants to engage people in a compassionate way.

21.   Love does not try to draw large crowds with his speech.

22.     He usually shares his views with one or two friends or sometimes by himself.

23.     In his effort to reach as many people as possible, Love frequently goes to public areas.  He often uses public sidewalks, spaces that let him convey his message to people as they walk by or stand in the vicinity.

24.     When Love speaks on public sidewalks, he does not obstruct pedestrian traffic.  He stands on a part of the sidewalk where others can pass by him.  Love is always willing to step aside and get out of someone's way.

25.     Love often goes to public sidewalks in close proximity to popular and well-attended public events.  He frequently travels to Atlanta, Georgia, to speak outside of such events, especially, events that occur inside Centennial Olympic Park, due to large numbers of people that he can find there.

26.     Love particularly wants to share his religious message on portions of public sidewalks surrounding the perimeter of Centennial Olympic Park that are in close proximity to the entrances of events occurring inside the park, so he can reach those entering or leaving the event without obstructing their passage.

**Nature of Centennial Olympic Park and Adjacent Public Sidewalks**

27.     Centennial Olympic Park is a public park located in the heart of downtown Atlanta, Georgia.  The Authority manages and operates the park.

6

28.    The park has been in existence for decades, beginning with the initial renovations for the 1996 Summer Olympic Games.   Following additional and substantial renovations made over the years, the property today is a full-scale public park fit for daily public use.

29.    Centennial Olympic Park contains 21 acres of scenic greenspace.  The park features several concert stages, an amphitheater, a large Centennial plaza with an iconic Fountain of Rings water feature, several other smaller plazas, pavilions, and a children's playground, as well as a Googie Burger restaurant.  The park also contains numerous wide-open grassy areas and scenic walkways that flow through it.

30.    Maintaining a capacity of 50,000, the park serves as host to a wide array of major entertainment and musical events throughout the calendar year.

31.    The Shaky Beat Music Festival is one such festival, transpiring in the park on an annual basis, with an extensive lineup of musical artists performing electronic dance music, hip hop, and indie rock across three different stages in the park.  A variety of vendor booths are posited throughout the park for the event.

32.    Centennial Olympic Park also acts as annual host for the Sweetwater 420 Festival, a weekend-long festival celebrating music and beer, along with

environmentalism, bringing live music to two stages, an artist market, charity events, environmental workshops, numerous food and alcohol vendors, and more.

33.     When the park is not used for an event, it remains open to the general public for recreational use.  No scheduling, registration, or fees are required for use of the park for these purposes.

34.     The park is surrounded by the following city streets: Baker Street, Centennial Olympic Park Drive, Park Avenue and Marietta Street.

35.     Public sidewalks are situated between the park and these public streets on all sides.  Measuring at approximately 20 feet wide, the bordering sidewalks act as thoroughfares for pedestrian traffic who travel to various parts of Atlanta, remaining open to the public all year-round, including times when events are happening inside the park.

36.     These sidewalks connect to, and are indistinguishable from, other city sidewalks running with city streets in downtown Atlanta.

37.     The sidewalks adjacent to Centennial Olympic Park do not contain any signs or markers indicating that access is off-limits or limited in any way.

38.     At all times, members of the public have unrestricted access to the sidewalks bordering the park, and use them for various activities, including

walking, jogging, loitering, and conversing.  These sidewalks are well-suited for expression.

39.   Centennial Olympic Park has fencing that goes around much of the perimeter of the park.  This fencing lies in between the park and the public sidewalks bordering it, representing a clear divider between the park and the sidewalks.  The park fencing contains dozens of gaps that allow for free pedestrian access to the park.

40.   When Centennial Olympic Park hosts events that require ticketing or payment for access, these gaps are closed through temporary fencing, as well as pre-existing gates, channeling event traffic to entry gates that are constructed for the purpose and duration of the event.

### Love's Religious Expression is Censored on Public Sidewalks Adjacent to Centennial Olympic Park

41.   Sometime during the spring of 2017, Love learned about the Shaky Beats Music Festival scheduled for Centennial Olympic Park in May of 2017. Believing the event would be a good draw, and thus, a good opportunity, Love was determined to go and stand on sidewalks outside the event to share his message.

42.   On May 6, 2017, Love went to the public sidewalks bordering Centennial Olympic Park so he could communicate his religious beliefs with

attendees of the Shaky Beats Music Festival.  He was accompanied by a couple of friends, Jeremiah Barker and Neil Monette.

43.     Positioning himself on a public sidewalk between Centennial Olympic Park Drive and the park, Love stood a 20 to 30 feet north of the intersection with Andrew Young International Boulevard.  Because the main entrance to the festival was located on Andrew Young International Boulevard, Love considered his spot on the sidewalk idyllic for communicating his religious beliefs to people, catching them as they entered or left the festival.

44.     Love did not try to enter the festival or participate in festival activities.  He only wanted to stand on the public sidewalks outside of the event and convey his message.

45.     Soon after their arrival, at around 4:00 or 5:00 p.m. that afternoon, Love held up a sign with a religious message, while Barker orally preached, and Monette passed out religious literature.  The plan was to rotate the different forms of expression between them.

46.     The section of sidewalk where Love and his colleagues stood and spoke is approximately 20 feet wide, leaving ample room for others to walk by him.  They did not impede traffic nor create any congestion on the sidewalk.

47.    After sharing his views there for almost one hour, Love and his friends were approached by police officers with the Authority who declared that they needed a permit from the Authority to share their views on the public sidewalk.   When the group inquired about obtaining a permit, the Authority clarified that no such permit was available to them, instructing Love and his friends to go across Centennial Olympic Park Drive to continue with their message.

48.    Love did not believe the Authority could constitutionally impose a permit requirement on him to speak on a public sidewalk, but he was willing to move as long as he could still share his message with people.  He did not believe he could reach many people across the street, but, in an effort to comply, and make the best out of the situation, he walked over so he could resume with his message. His companions went with him.

49.    They walked directly to other side of Centennial Olympic Park Drive, and stood on sidewalk 20 feet north of Andrew Young International Blvd.  After arriving to this spot, Love began to orally preach, but he quickly deduced that the new venue was a very poor one for his speech.

50.    Nearly everyone entering or leaving the festival used the sidewalks on the park side of Centennial Olympic Park Drive.  With four lanes of busy vehicular

traffic between Love and his intended audience, he was thwarted from getting his message across.  Love and the others tried their best to reach people from where they were forced to stand, but their efforts were in vain.

51.     Following forty-five minutes of futility, Love and his two friends decided to go back to the sidewalks on the park side of Centennial Olympic Park Drive.  This time, they stood on the south side of Andrew Young International Blvd., about 20 feet away.  Love firmly believed he has a constitutional right to share his beliefs on the sidewalk, and he was optimistic that they could convince the police officers to acknowledge their rights.

52.     But sometime around 7:00 or 8:00 p.m. that evening, Lt. Jackson and two other police officers with the Authority's Department of Public Safety, Law Enforcement Division, approached Love and his companions.

53.     Lt. Jackson abruptly asked them whether they had a permit for "protesting" on the sidewalks.  To which inquiry, Barker, speaking for the group, explained that they were not protesting, but preaching.

54.     The lieutenant informed that they needed a permit to engage in their expression on the public sidewalk, and without one, they would have to go back to the opposite side of Centennial Olympic Park Drive.

55.    Because they were not eligible for a permit, the group was effectively banned from the sidewalk.  Barker objected, asserting the group's constitutional right to share their views on a public sidewalk, but Lt. Jackson disagreed.  The officer claimed the sidewalks are "state property" and the group could not speak in that area without receiving the requisite permit from the Authority.

56.    Resting on the group's constitutional rights, Barker refused to stop speaking on the sidewalk.   Lt. Jackson consequently arrested Barker, handcuffing him and placing him in the back of a police vehicle.

57.    Love was shocked by the arrest; he feared he would be next.  The Authority police instructed Love and Monette to relocate to the opposite side of Centennial Olympic Park Drive.  After seeing what happened to Barker, and fearing arrest, Love complied, as did his colleague.

58.    Love and Monette walked to the opposite side of the street, staying on the south side of Andrew Young International Blvd.  Love was anxious to see what would happen to Barker.  In the meantime, he tried to preach again, but as before, his speech was ineffective because his audience could not hear him from across the street.

59.    Approximately a half an hour later, the Authority police released Barker, who then joined Love and Monette on the opposite side of Centennial

Olympic Park Drive.  Barker explained the police gave him a criminal trespass warning, banning him from the park and bordering sidewalks, for a period of three years.

60.    Hearing this news, Love feared he would be arrested and subject to a trespass ban if he returned to the sidewalks bordering Centennial Olympic Park to share his religious message.  And realizing that he could not reach his audience from the opposite side of the street, Love soon abandoned his message and left.

## The Authority Explains Basis for Ban on Speech and Confirms Continued Enforcement of Ban

61.    Love strongly desires to return to the public sidewalks adjacent to Centennial Olympic Park and share his religious views while large events are taking place in the park, but he does not want to risk criminal arrest.

62.    Barker was likewise dissatisfied with the situation.  Hoping to resolve the conflict without litigation, Barker secured legal counsel, who sent a letter on his behalf on August 9, 2017 to Frank Poe, Paul Guerricci, and J. Pargen Robertson, legal counsel for the Authority.  The letter recounted the events that happened on May 6, 2017 and explained how the ban on expression on public sidewalks violates constitutional rights.

63.    This letter sought relief from these Authority officials that would allow Barker specifically, and by extension, Love and Monette, to speak again on

14

the sidewalks.  The letter requested written assurance that individual and small group religious expression be allowed on the sidewalks bordering the park in the future, among other forms of relief.

64.    On September 1, 2017, the Authority responded to the letter, but the response did not offer relief.

65.    In the response, the Authority emphasized its statutorily-given control over activity and expression occurring on sidewalks and streets next to the park, as well as the park itself, citing  Official Code of Georgia Annotated (OCGA) § 10-9-14, stating the Authority can:

> adopt reasonable rules and regulations governing the use **during an event period** of **sidewalks and public streets immediately adjacent** to any project of or under the control and management of the authority so as to ensure the safe and orderly operation of the project and such areas**, to prevent disruption of and interference with the conduct of such event**, and to prevent public solicitation or public distribution of literature which is competitive with the activities of the person to whom the authority has granted the right to conduct such event.

(Emphasis in response letter).

66.    The referenced law, OCGA § 10-9-14, purportedly gives the Authority power over bordering sidewalks and public streets and to take any affirmative steps deemed warranted to prevent "disruption" or "interference" in those venues while an event is occurring inside the park.  The law specifically

empowers the Authority to ban solicitation and literature distribution transpiring on sidewalks or streets bordering the park.

67.     As the Authority explains in the response letter, OCGA § 10-9-14 also enables the Authority to promulgate rules and regulations that facilitate the goals of the law.

68.     The Authority cites Regulations and Ordinances § 4.23.1 as such regulation proscribing the expression Barker, Love, and Monette were engaged in, defining a "Public Assembly" as follows:

> The term "Public Assembly" means any public assembly, meeting, gathering, demonstration, parade, picketing, march, or other similar concerted activity **where the intent of the activity is to publicly communicate views in such a manner or with such volume as to carry the communication to the general public in the vicinity of the activity.**

(Emphasis in response letter).

69.     In the response letter, the Authority also clarifies that a permit is not available to persons like Barker and Love because public expression is strictly prohibited on the adjoining sidewalks during events that transpire inside the park, quoting its Regulations and Ordinances, § 4.23.14.4 as justification:

> **A Public Assembly may not be conducted within the area of the facilities designated for a Scheduled Event** (including another permitted Public Assembly) during the time within which the Scheduled Event is being conducted…

16

(Emphasis in response letter).

70.    Referring back to § 10-9-14, the Authority further explains that this prohibition bans the public sharing of religious views on the public sidewalks outside the park.

71.    Love was subsequently apprised of the response letter and its contents.   Like Barker, he is perpetually prohibited from communicating his religious views on sidewalks bordering Centennial Olympic Park while events are taking place in the park.

72.    The Authority confirmed that it would continue to ban the public communication of religious views on public sidewalks on the perimeter of Centennial Olympic Park while events occur inside the park, subjecting Love to criminal arrest for religious speech on those sidewalks.

73.    The next event at which Love would like to speak on a sidewalk adjoining Centennial Olympic Park is the Sweetwater 420 Festival, an event scheduled for April of 2018.  He eagerly desires to return to the public sidewalks on the perimeter of Centennial Olympic Park and share his Christian message while that event is happening, but as long as the ban on his speech exists, the threat of criminal arrest prevents him from exercising this constitutional right.

74.     The impact of prohibiting Love from engaging in constitutionally-protected expression in traditional public fora constitutes irreparable harm to him.

75.     There is no adequate remedy at law for the ongoing deprivation of Love's constitutional rights.

## FIRST CAUSE OF ACTION

### Violation of Free Speech Clause

76.     Love's religious expression constitutes protected speech under the First Amendment.

77.     The Authority's policies and practices, and enforcement thereof:

    a.     are vague and overbroad;

    b.     prohibit the free speech of Love and other third-party citizens;

    c.     allow for the exercise of unbridled discretion;

    d.     lack narrow tailoring, fail to achieve any legitimate government purpose, and fail to leave open ample alternative avenues for expression; and

    e.     amount to a patently unreasonable ban on protected speech in traditional public fora.

78.     Defendants have no compelling or legitimate reason that can justify their broad restriction on Love's expression.

79.     Defendants' policies and practices, and the enforcement thereof, thus violate the Free Speech Clause of the First Amendment to the United States Constitution, made applicable to the States through the Fourteenth Amendment.

WHEREFORE, Love respectfully prays the Court grant the equitable and legal relief set forth in the prayer for relief.

## SECOND CAUSE OF ACTION

### Violation of Due Process Clause

80.     Defendants' policies and practices are vague and lack adequate objective standards needed to curtail the broad discretion of Authority officials. This affords Defendants opportunity to enforce the policies in an *ad hoc*, arbitrary, and discriminatory manner.

81.     Defendants have no compelling or legitimate reason justifying their vague policies.

82.     Defendants' policies and practices, and their application to Love, therefore violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

WHEREFORE, Love respectfully prays the Court grant the equitable and legal relief set forth hereinafter in the prayer for relief.

## PRAYER FOR RELIEF

WHEREFORE, Love respectfully prays for relief in that this Court:

A.    Assume jurisdiction over this action;

B.    Enter a judgment and decree declaring that the Authority's policy banning disfavored expression on public sidewalks that lie between the outer perimeter of Centennial Olympic Park and city streets, is unconstitutional on its face and as applied to Love's desired expression because it violates his fundamental rights as well as the rights of third parties not before the Court, as guaranteed under the First and Fourteenth Amendments to the United States Constitution;

C.    Enter a preliminary and permanent injunction enjoining defendants, their agents, officials, servants, employees, and all persons in active concert or participation with them, or any of them, from applying the Authority's policy banning the constitutionally-protected speech of Love and others on public sidewalks adjacent to public streets on the perimeter of Centennial Olympic Park;

D.    Adjudge, decree, and declare the rights and other legal relations with the subject matter here in controversy, in order that such declaration shall have the force and effect of final judgment;

E.    That this Court award Love nominal damages as an important

vindication of his constitutional rights;

F.    That this Court award Love his costs and expenses of this action, including reasonable attorneys' fees, in accordance with 42 U.S.C. § 1988 and other applicable law; and

G.    Grant such further relief as appears to this Court to be equitable and just.

Respectfully submitted,

<table>
<tr><td>s/ Nathan W. Kellum</td><td>s/ TERRY L. LLOYD</td></tr>
<tr><td>Nathan W. Kellum*</td><td>TERRY L. LLOYD</td></tr>
<tr><td>TN Bar #13482; MS Bar # 8813</td><td>GA Bar # 455349</td></tr>
<tr><td>Center For Religious Expression</td><td>TERRY L. LLOYD, P. C.</td></tr>
<tr><td>699 Oakleaf Office Lane, Suite 107</td><td>10 Lumpkin Street</td></tr>
<tr><td>Memphis, TN 38117</td><td>Lawrenceville, GA  30046</td></tr>
<tr><td>(901) 684-5485 – Telephone</td><td>Tel:  770-962-0118</td></tr>
<tr><td>(901) 684-5499 – Fax</td><td>Fax:  770-963-3424</td></tr>
<tr><td>nkellum@crelaw.org</td><td>terrylloyd@bellsouth.net</td></tr>
<tr><td>Attorney for Plaintiff Eric Love</td><td>Attorney for Plaintiff Eric Love</td></tr>
<tr><td>*Motion for Admission <i>pro hac vice</i> filed concurrently</td><td></td></tr>
</table>

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 22, 2017, the foregoing was filed electronically with the Clerk of the Court using the CM/ECF system, and that a copy of the foregoing will be delivered to a process server for service on defendants.

s/ TERRY L. LLOYD
Attorney for Plaintiff

## VERIFICATION OF COMPLAINT

I, Eric Love, a citizen of the United States and a resident of Douglasville, Georgia, hereby declare that I have read the foregoing Verified Complaint and the factual allegations therein, and the facts as alleged therein are true and correct.

Eric Love